494 P.3d 117
The PEOPLE of the State of Colorado, Petitioner,
v.James FRAZIER, #48979, Respondent.
Case Number: 19PDJ053
Office of Presiding Disciplinary Judge of the Supreme Court of Colorado.
June 16, 2021. ORDER REVOKING PROBATION UNDER C.R.C.P. 251.7(e)
WILLIAM R. LUCERO, PRESIDING DISCIPLINARY JUDGE
After serving a four-month disciplinary suspension in 2020, James Frazier ("Respondent") was placed on probation, with the requirement that he successfully complete probationary conditions. Because he failed to comply with practice monitoring conditions during his period of probation, his probation must be revoked and the remaining eight months of his suspension must be activated.
I. PROCEDURAL HISTORY On December 30, 2019, the Presiding Disciplinary Judge ("the Court") approved an "Amended Stipulation, Agreement and Affidavit Containing the Respondent's Conditional Admission of Misconduct," suspending Respondent from the practice of law for one year, with four months to be served and the remaining eight months to be stayed upon the successful completion of a two-year period of probation. In the stipulation, Respondent agreed that he violated Colo. RPC 1.3 ; Colo. RPC 1.4(a)(3) ; Colo. RPC 1.6(a) ; Colo. RPC 1.8(f) ; Colo. RPC 8.4(g) ; Colo. RPC 1.15A(a) ; Colo. RPC 1.15B(a)(2) ; and Colo. RPC 1.15C(a).
The suspension took effect February 3, 2020. Respondent was reinstated from his suspension by order on June 3, 2020; his probation began that same day. As part of his probation, Respondent was required to successfully complete trust and ethics school, attend a continuing legal education course, review a publication on unbundled legal services, commit no additional rule violations, and, as relevant here, abide by practice monitoring requirements. The practice monitoring conditions contained the following relevant deadlines, which began to run "from the date the order is entered in this case": (1) the Office of Attorney Regulation Counsel ("the People") and Respondent were to agree on a person to serve as a monitor within fifteen days; (2) Respondent was to undergo a law office audit to be completed within sixty days and; and (3) Respondent was to submit an audit report to the People within fifteen days of the audit's completion.1 Thereafter, Respondent was to meet with his monitor monthly for the first six months of his probation, every other month for the second six months, and then quarterly for the second year of his probation. The practice monitoring agreement also contained specific instructions for Respondent and his monitor to fulfill these requirements.2 On March 11, 2021, the People filed a "Motion for Order to Show Cause Under C.R.C.P. 251.7(e)" alleging that Respondent may have violated the terms of his probation by failing to participate in the required practicing monitoring. The Court issued a show cause order. On March 30, 2021, Respondent filed his response to the show cause order and requested a hearing, which the Court set for May 18, 2021.
At the May probation revocation hearing, Alan C. Obye appeared for the People, and Respondent appeared pro se. The Court admitted stipulated exhibits S1-S62 and Respondent's exhibits A-D, and it considered testimony from Respondent and Ted Gardenswartz.
The day after the hearing, Respondent filed a "Motion to Introduce Additional Exhibits and Request for Clarification About the Function of the Office of Attorney Regulations," and "Respondent's Additional Requested Exhibits for May 18, 2021." The People responded in opposition on May 21. Respondent replied without leave of Court three days later. The Court denied his motion and request that same day. On May 24, 2021, Respondent filed an "[Amended] Motion for Clarification Re: Order Introduce Additional Exhibits and Request for Clarification About the Function of the Office of Attorney Regulation[ ]," And on May 26, He Filed a "Motion To Accuse the People of Prosecutorial Misconduct for Violation of [Colo. Rpc] 3.8(c)." the Court Denied Both Motions on June 1, 2021.
II. FINDINGS OF FACT The People allege that Respondent violated his probationary conditions by failing to comply with the practice monitoring conditions during his probation, specifically by failing to maintain a practice monitor and to timely submit the practice audit report. The Court makes findings of fact below about Respondent's practice monitoring.3 Background
During his suspension, Respondent lived in the Roaring Fork Valley. Respondent is legally blind and had moved to that area because of the accessible bus system. During that time, Respondent experienced several health issues. He also lived in a house with several roommates, which was not conducive to maintaining confidential client files. He testified that he wanted his law practice to focus on domestic relations law, not criminal law, and thus he wanted a family law practice monitor during his probation.
In May 2020, the People and Respondent agreed that lawyer Ted Gardenswartz would serve as Respondent's practice monitor. Respondent testified that between June and October 2020, he emailed or spoke with Gardenswartz for about twenty minutes once a week. They never met in person during this time. Respondent acknowledged that he understood when the audit report was due. Respondent testified, however, that his primary focus during this time was securing better housing and that he "did not have a great mind" to complete an audit of his law practice. Nevertheless, he emailed Gardenswartz on June 8, 2020, discussing various practice matters and listing several items that he would try to assemble over the following month for Gardenswartz's review.4 Gardenswartz testified that he and Respondent discussed several of Respondent's domestic relations cases, confidentiality concerns, getting new office space, obtaining legal malpractice insurance, and whether Respondent should disclose past ethical violations to prospective clients.5 Respondent completed a self-assessment for Gardenswartz and kept the People apprised of his communications with him. According to Gardenswartz, he tried to assist Respondent to fulfill his probationary conditions and to build a successful practice, but he felt like they "never got where they needed to go." Gardenswartz also found Respondent to be exasperated and socially frustrated during this time.
In October and November 2020, Respondent and Gardenswartz's monitoring relationship began to deteriorate. Respondent maintained that his relationship with Gardenswartz broke down for several reasons, including that he believed Gardenswartz spoke with his family in Michigan without his permission and that Gardenswartz pushed him to practice criminal law despite his fervent wish not to do so. Respondent testified that he also wanted to leave the Roaring Fork Valley and move to Durango so that he could live in a place without roommates and receive medical care for his ongoing health concerns. According to Respondent, he felt irritable and upset with his living situation and was not physically healthy.
Respondent testified that he signed an apartment lease and moved to Durango on November 2, 2020. Four days after his move, Respondent emailed the People expressing an intent to fire Gardenswartz and asking for a new practice monitor in Durango.6 He stated that he would file a motion with the Court for Gardenswartz's removal if the People did not agree.7 He also listed several reasons for removing Gardenswartz, including his belief that Gardenswartz had unauthorized contact with his family.8 Respondent stated that while he had no direct evidence to support this allegation, enough circumstantial evidence existed to prove the communication occurred. Specifically, he said, Gardenswartz pressured him to practice criminal law, much like his family—who has a history of meddling in his professional affairs—always had.
Respondent sent a second email to the People the same day.9 In that email, Respondent expressed anger that he had recently received five unexplained inquiries from potential clients who wanted his assistance in handling their traffic matters.10 Respondent testified that he was upset because he had not targeted traffic cases and thus believed Gardenswartz was behind the inquiries. These types of criminal cases were not helpful to his practice, he said, because he only wants to practice domestic law. Gardenswartz denied speaking with Respondent's family or referring to Respondent any cases during their monitoring relationship.
Gardenswartz withdrew as Respondent's practice monitor on November 9, 2020. No practice audit was ever completed.
Two months later, Respondent had yet to agree with the People on a new practice monitor. On January 5, 2021, the People emailed Respondent to see whether he had settled in Durango or found a monitor.11 Respondent replied the next day that he was not settled and was actually embroiled in a pro se lawsuit he filed against his landlord for refusing to put locks on his windows and to complete other repairs.12 Respondent indicated that it would be at least March or April 2021 until the repairs would be done, and that he would need a family law monitor at that point.13 He also asked the People for a "formal screen" and "written guidelines" to keep his "family out of" his life.14 According to Respondent, he wanted the People's formal assurances that any practice monitor selected would have no contact with his family.
By the end of February 2021, nearly four months after Gardenswartz's withdrawal, Respondent still had no practice monitor in place. On February 26, 2021, Respondent emailed Renee Anderson and Nicolette Chavez, who work for the People. He told Anderson that "putting a new monitor on stuff is like putting lipstick on a pig" and that there were "deep underlying flaws with my case that wo[ ]n't be addressed with just a new monitor."15 He thus told her that he would eventually file a motion with the Court to resolve, at a minimum, whether a formal screen would be put in place to prevent a new monitor from speaking with his family. He vowed to "circle back" when he was settled, which might take up to six months.16 He also instructed Chavez "to take no action towards finding" him a practice monitor.17 He further opined that any monitor referred by the People was "contaminated" with the view that he should practice criminal law and thus he needed to "kill the source of that contamination."18 Respondent explained in his testimony that potential monitors believe it is in his best interest to practice criminal law, which has been seriously detrimental to his mental health. As such, he wanted to "kill" those beliefs. He also declared that he could not get a practice monitor until his apartment had locks on every door and window, which had yet to be accomplished.
On May 13, 2021—five days before the hearing in this matter—Respondent emailed the family court facilitator in Durango asking for names of lawyers who might be willing to serve as his practice monitor.19 The facilitator was unable to provide him with any recommendation.20 This frustrated him, he explained, because he was making efforts to find a monitor in Durango; when the family court facilitator could not give him a name, he said, he felt tempted to "throw up my hands and say I do not know what to do."
At the time of his probation revocation hearing, Respondent had no practice monitor, and no audit or report had been completed. He also maintained that his only open case was his own litigation pending against his landlord, which it would be an "absurd" waste of the monitor's time to oversee.
III. LEGAL STANDARDS AND ANALYSIS C.R.C.P. 251.7(e) permits the People, should they receive information indicating that a lawyer may have violated probationary conditions, to move for an order requiring the lawyer to show cause why her or his stayed suspension should not be activated. If either party so requests, the Court must hold a hearing on the motion.21 At such a hearing, the People have the burden of establishing probationary violations by a preponderance of the evidence.22 The Court must thereafter decide whether to revoke the lawyer's probation.23 Respondent asks the Court to exercise its discretion to allow him to remain on probation for an additional two years, rather than revoke his license. He maintains that he is willing to do "whatever is necessary" to build a practice in domestic relations, including securing a new practice monitor. He demands a new contact within the Office of Attorney Regulation Counsel, however, and he insists that the People find him a monitor from the Colorado Bar Association's family law section. But before this is done, he maintains, he needs to make his apartment secure, as no monitor would approve of his current living situation. He is adamant that he made best efforts to comply with the practice monitoring under his current conditions but that his efforts were thwarted by his living arrangements and the breakdown of his monitoring relationship with Gardenswartz.
For their part, the People argue that Respondent has refused since November 2020 to cooperate with his probationary monitoring conditions. They also lack confidence that any monitoring relationship will be successful because any time a monitor even mentions criminal law to Respondent, the relationship breaks down. Further, the People aver that they cannot control a monitor's advice regarding Respondent's practice and are unable to formally prevent a monitor from speaking with Respondent's family. The People thus ask the Court to revoke probation and lift the stay on Respondent's eight-month suspension.
As discussed above, Respondent has lacked a practice monitor since early November 2020. In addition, he never completed a practice audit or submitted a report, as he had agreed to do. The Court credits Respondent's testimony that he has had trouble finding a place to live and that he made some efforts with Gardenswartz. But the People persuasively argue that Respondent is unlikely to comply with the terms of a monitoring agreement for an additional two years absent a specific set of circumstances that he expects the People to bring into being: securing for him a monitor from the CBA family law section, preventing the monitor from mentioning criminal law, and formally forbidding a monitor from speaking with his family.
After careful consideration, the Court sides with the People. In June 2020, Respondent agreed that Gardenswartz should serve as his practice monitor. He communicated with Gardenswartz regularly through October. But because he failed to adhere to the practice audit condition, no report was ever submitted to the People, even though Respondent was aware of the deadline. Once the monitoring relationship with Gardenswartz deteriorated—almost solely, as far as the Court can determine, due to Respondent's unsupported suspicions that Gardenswartz had spoken with his family and had pushed him into criminal law—Gardenswartz resigned, leaving Respondent without a monitor beginning in November 2020. Since then, Respondent has failed to cooperate with the People to obtain a new monitor, citing difficulties with his apartment, a lack of current cases, and his pending lawsuit against his landlord as unsurmountable obstacles preventing his compliance. Respondent's emails to the People insisting that they take no action further evince his lack of interest in abiding by the practice monitoring requirement. Aside from his email to the Durango family court facilitator a few days before the hearing in this matter, Respondent presented no evidence that he has made any effort since Gardenswartz's departure to fulfill his monitoring conditions.
The Court thus concludes that the People have met their burden of establishing by a preponderance of evidence Respondent's violation of a condition of probation. Because he has failed to satisfy his practice monitoring conditions under the terms of the parties' stipulation, his probation should be revoked and he should be suspended for the remaining eight months of his disciplinary sanction, which was stayed conditioned on his successful completion of his probationary conditions. He has presented no compelling reason to stray from the terms of that agreement. As such, it is appropriate to revoke Respondent's probation and activate his suspension. IV. ORDER The Court REVOKES Respondent's probation, LIFTS the stay on Respondent's eight-month suspension, and SUSPENDS Respondent from the practice of law for EIGHT MONTHS, EFFECTIVE WEDNESDAY, JUNE 30, 2021.
On that date, the Court will issue an "Order and Notice of Suspension." Within fourteen days thereafter, Respondent SHALL comply with C.R.C.P. 251.28(d), requiring a lawyer to file an affidavit with the Court setting forth pending matters and attesting, inter alia , to notification of clients and of other jurisdictions where the lawyer is licensed. Should Respondent wish to resume the practice of law, he will be required to submit to the People, within twenty-eight days before the end of his suspension, an affidavit complying with C.R.C.P. 251.29(b).
1 Am. Stip. Ex. 3. The language in the practice monitoring document does not clearly state whether the deadlines in the agreement are triggered from the date of the order approving the stipulation or from the order reinstating Respondent to the practice of law. The People concede, however, that the triggering date should be interpreted in Respondent's favor. Mot. for Order to Show Cause at 2. They suggest using June 3, 2020, as the triggering date, which is the date Respondent was reinstated to the practice of law and placed on a two-year period of probation. The Court agrees that the June 3, 2020, should trigger Respondent's practice monitoring deadlines. Accordingly, Respondent's practice audit should have been completed by August 3, 2020, with the audit report submitted fifteen days thereafter.
2 See Am. Stip. Ex. 3.
3 Where not otherwise indicated, facts are drawn from the testimony provided at the probation revocation hearing.
4 Ex. A.
5 See Ex. C.
6 Ex. S43.
7 Ex. S43.
8 Ex. S43.
9 Ex. S44.
10 Ex. S44.
11 Ex. S52.
12 Ex. S52.
13 Ex. S52.
14 Ex. S52.
15 Ex. S58.
16 Ex. S58.
17 Ex. S58.
18 Ex. S58.
19 Ex. D.
20 Ex. D.
21 C.R.C.P. 251.7(e).
22 Id .
23 Id .